J-S64017-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| J.L.J. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | |
| S.L.J. N/K/A S.L.M. | |
| Appellant | |
| v. | |
| A.P. & B.P., JR. | No. 1093 MDA 2015 |

Appeal from the Order Entered May 27, 2015
In the Court of Common Pleas of York County
Civil Division at No.: 2009-FC-000619-03

BEFORE:  FORD ELLIOTT, P.J.E., WECHT, J., and FITZGERALD, J.[*]

MEMORANDUM BY WECHT, J.:            **FILED DECEMBER 07, 2015**

S.L.J. ("Mother") appeals the May 27, 2015 order that disposed of J.L.J.'s ("Father") petition for modification of custody and A.P. and B.P., Jr.'s ("Maternal Grandparents") complaint for partial custody.  After careful review, we affirm.

Mother and Father are the parents of C.R.J. ("Child"), born in January 2005.  Mother and Father separated around Christmas 2006, and divorced on July 9, 2007.  As of April 2007, Mother resided in Montgomery County. She had primary physical custody of Child and Father had custody every other weekend plus every Thursday evening.  By April 2009, when Father

_____

[*]     Former Justice specially assigned to the Superior Court.

filed a complaint for custody, Mother had moved to York County, Pennsylvania, (with Father's consent) and Father had moved to New Jersey. In September 2009, the parties reached a custody agreement that was entered as an order on October 2, 2009. Mother had primary custody. Father had alternate weekends during the school year with ten additional overnights to be selected that did not interfere with Child's school and five weeks in the summer.

Custody was modified again in May 2012. During the school year, Father had custody for one extended weekend per month and, if the school calendar did not have an extended weekend, then Father had two weekends in that month. For the summer, the parties alternated custody with Father having three weeks, followed by Mother having two weeks.

On May 30, 2014, Father filed a petition for contempt and for modification of custody. Father alleged that Mother had violated the 2012 custody order in a variety of ways,[1] and he sought to modify the custody schedule. Also, on June 2, 2014, Maternal Grandparents filed a complaint for custody, in which they sought partial physical custody and to have their

_____

[1] For example, Father alleged that Mother failed to keep Father informed of medical appointments and treatment, failed to inform Father of school meetings, failed to notify Father when Mother was out of town, failed to notify Father of Child's out-of-state travel, failed to inform Father of the names of childcare providers, scheduled activities during Father's custodial time, withheld Child from Father during Father's custodial time, and interfered with Father's phone calls with Child.

complaint consolidated with Father's custody action. On September 12, 2014, the trial court ruled upon Father's petition for contempt. Although the court did not find Mother to be in contempt, the court issued some clarifications of the custody order to promote communication between Child and Father.

After Father filed his petition and approximately two weeks before the trial started, Mother informed the trial court that she intended to move from York, Pennsylvania to Huntingtown, Maryland because her employer had offered to relocate her. Mother sought to retain primary custody of Child in Maryland. However, Mother never provided notice of the relocation as required by 23 Pa.C.S.A. § 5337.

The trial court heard testimony on March 6, April 24, and May 1, 2015. Father lives in Toms River, New Jersey. Joint Stipulations, 5/28/2015, at 2. He lived with M.W.-J. ("Wife") in a house owned by Wife's parents, D.A.F. ("Father-in-Law") and C.F. *Id.* at 3. Because the house had been damaged by Hurricane Sandy, Father, Wife, and her parents had been living about an hour away with Father's mother while repairs were made. Notes of Testimony ("N.T."), 4/24/2015 (afternoon), at 7.[2] Father testified that he

---

[2] From the record, it appears that some of Father's testimony may be missing. The April 24, 2015 transcript notes that Father's direct examination was continued from an earlier time. N.T., 4/24/2015, at 6. However, no testimony from Father is recorded either in the morning or afternoon volumes of the March 6, 2015 testimony. No other transcript has been
*(Footnote Continued Next Page)*

- 3 -

had communication issues with Mother and that Mother recently withdrew Child from soccer without talking to Father about it. *Id.* at 16. Father stated that, previously, if Child had a Saturday soccer game on Father's scheduled weekend, Mother refused to transport Child from soccer to the scheduled custody exchange point and instead required Father to pick Child up from soccer. *Id.* at 14-15. Father had difficulty Skyping with Child because Mother would not initiate a call or would refuse to take a call, claiming that there was a schedule conflict or that Father was late. *Id.* at 35-38. When Father went to pick Child up after the March 6, 2014 court date, Mother's husband, J.M. ("Husband"), told Father that he was not welcome and that he could not enter the house. This conversation occurred when Child was close enough to overhear. *Id.* at 39-40. Father learned of Mother's proposed move when Child told him about it. *Id.* at 29. Father testified that Mother told him that she was required to move for work, even though it was not true. *Id.* at 28.

Initially, Father sought more time with Child, but thought that Child should stay in Mother's primary care because Child, who suffered from learning difficulties, had been making so much progress. *Id.* at 30. However, when he learned that Child would be moving to Maryland, he sought primary custody. *Id.* at 30-31. Father talked with staff at Child's

_(Footnote Continued)_ ⎯⎯⎯⎯⎯⎯⎯

entered in the certified record and we can find no reference to any other hearing date in the record.

potential school in New Jersey and was convinced that the school could handle Child's learning needs. *Id.* at 12-14. Father has been in communication with Child's psychologist and kept him informed of Child's progress while at Father's house. *Id.* at 29. Father also discussed the possible transition to New Jersey with Child's psychologist. *Id.* at 42-43.

Father encouraged Maternal Grandparents' involvement in Child's life because Maternal Grandparents provided a great deal of care for Child when he was young. Father believed that Maternal Grandparents are important to Child. *Id.* at 24-25. To that end, Father has included Maternal Grandparents in Christmas and other events. *Id.* at 26-27.

Mother testified that she lives in York, Pennsylvania, with Husband, Child, and J.A.J. ("Brother"), her three-year-old son with Husband. *Id.* at 82. Mother stated that Child and Brother get along well, but that there is competition for attention at times. *Id.* at 83. Child gets along well with Husband, too. *Id.* Mother indicated that Husband is retired and is therefore able to care for Child and Brother. *Id.* at 95. Mother works in human resources and has worked primarily in Harrisburg or Bowie, Maryland; however, travel to other sites was necessary at times. *Id.* at 97. Recently, though, Mother's company merged with another, and Mother's region grew. *Id.* at 98. Mother's region is now focused on Chantilly, Virginia, Baltimore, and Bowie, Maryland, although working in Harrisburg remained an option. *Id.* at 99. Mother's home in York is a two-hour drive to her closest office. *Id.* at 100. Mother testified that her move to Huntingtown, Maryland, would

allow her to be home more and to spend less time travelling and commuting. *Id.* at 104-05. The new location would add one half-hour each way to the distance to Father's house. *Id.* at 200. Mother admitted that she did not inform Father about the move immediately because Mother did not believe that the move constituted a relocation under the custody statute. *Id.* at 174. Mother entered into a contract to build her new home in Maryland in April 2015, after the custody litigation had begun. *Id.* at 202.

Mother was Child's primary caretaker, although Child did attend daycare. For one year, Maternal Grandparents helped with childcare. *Id.* at 85. Mother contended that Father's active involvement in Child's life only has been recent. Mother noted that Father had not attended soccer games, school activities, or doctor appointments consistently. *Id.* at 89-90. Mother contended that Father was the cause of the communication difficulties regarding custody. *Id.* at 168-70. Mother admitted that she cut off contact between Maternal Grandparents and Child after Maternal Grandparents filed to intervene in the custody case. *Id.* at 178.

Child's first-grade teacher brought Child's learning difficulties to Mother's attention and she had him start seeing his current psychologist. *Id.* at 85-86. Mother has worked with Child on exercises to improve his reading on a daily basis. *Id.* at 196. In considering relocating, Mother reviewed schools and found one that offered programs comparable to those that Child already was receiving. *Id.* at 109.

Child testified in camera. Child testified that Husband usually gets him ready for school and watches him after school because Mother is at work. N.T., 3/6/2015 (afternoon), at 37-38. Husband also is generally the person who disciplines Child while he's in Mother's custody. *Id.* at 41. Child described a sometimes difficult relationship with Husband, but also testified that Husband helps Child with his homework. *Id.* at 42-43. Child enjoys his time with Father. *Id.* at 46. Father and Wife sometimes attend Child's soccer games. *Id.* at 49. Child did not want to move to Maryland. *Id.* at 51-52. Child testified to his good relationship with Maternal Grandparents and expressed the wish that there was an extra weekend in the month so he could have a weekend with Maternal Grandparents without losing time with Mother and Father. *Id.* at 55-56, 62-63.

Maternal Grandmother testified about her close relationship with Child. N.T., 5/1/2015, at 6. However, when recommended by Child's psychologist, Maternal Grandparents stepped back from spending as much time with Child. *Id.* at 7. Father has a good relationship with Maternal Grandparents and supports their time with Child. *Id.* at 8. Maternal Grandmother testified that Child is more relaxed and happy at Father's home and believed that it was in Child's best interest to live primarily with Father even though that would limit Maternal Grandparents' time with Child. *Id.* at 10, 14. Maternal Grandmother reached out to Father because she had concerns about Husband's relationship with Child and about Child's medical condition. *Id.* at 39-40.

Child's treating psychologist, Dan Ingram, Psy.D., testified. Dr. Ingram diagnosed Child with situational depression, phonological dyslexia, dysgraphia, and ADHD. N.T., 3/6/2015 (morning), at 9, 83. Dr. Ingram has worked significantly with Child's school to develop a plan that meets Child's educational needs. *Id.* at 82. Dr. Ingram described Child as very emotional, very manipulative, and very affected by conflict. *Id.* at 57-58. Dr. Ingram felt that Child's view about who he wants to live with is colored by whom he was with most recently. *Id.* at 72. Dr. Ingram testified that he works with Mother and Father and their respective spouses as well as Child and that he communicates with Father after Child's sessions to keep Father informed. *Id.* at 58-59. Dr. Ingram expressed no concerns about Husband in regards to his care of Child and found Husband to be knowledgeable about Child's problems and needs. *Id.* at 62-63. Although Mother expressed concerns about Maternal Grandparents' stability, Child was very positive about his time with them. *Id.* at 64-65. Given Maternal Grandparents history in Child's life, Dr. Ingram opined that ongoing access is in Child's best interest, but that Maternal Grandmother must keep Child out of the conflict between her and Mother. *Id.* at 98. Dr. Ingram recognized that Mother has more insight and involvement in Child's school and treatment, but believed that, if Child were to live with Father, Father would provide good care and would be as involved. *Id.* at 74-75. Dr. Ingram cautioned that any change in school for Child would have to be well-planned given

Child's educational needs. N.T., 4/24/2015, at 130. Dr. Ingram also opined that a change in school would be a difficult transition for Child. *Id.* at 140.

Peter H. Thomas, Ph.D., a psychologist, provided a custody evaluation and testified as an expert witness. N.T., 3/6/2015 (morning), at 9. Dr. Thomas recommended, without knowledge of Mother's proposed relocation, that Mother remain primary custodian because Child is strongly attached to Mother. *Id.* at 12. However, Dr. Thomas was concerned about Husband because Child and Husband had conflicts. *Id.* at 10-11. Dr. Thomas described Husband as "aggressive . . . with an undercurrent of some anger and probably some tendency to be involved in conflicts." *Id.* at 11. Dr. Thomas opined that Husband may have made the conflict between Mother and Maternal Grandparents more difficult because Husband handled issues with them "in a more angry fashion." *Id.* at 33. Dr. Thomas also stressed that, although Husband is present in the home more than Mother, Mother must remain the primary disciplinarian. *Id.* at 12. When informed about Mother's move, Dr. Thomas was concerned about separating Child from his school, environment, and current therapist, and also the increased distance between Child and Father and Maternal Grandparents. *Id.* at 15-16. Dr. Thomas found Maternal Grandmother to be difficult and to have trouble respecting boundaries. *Id.* at 33. However, Dr. Thomas found Child's relationship with Maternal Grandparents to be an important part of his life. *Id.* at 34. Dr. Thomas acknowledged that Father has a more positive relationship with Maternal Grandparents than Mother does. *Id.* at 46.

Wife testified that she had a good relationship with Child. N.T., 4/24/2015, at 64. Wife confirmed that there are difficulties between Mother and Father in relation to custody and corroborated Father's account of his relationship with Mother. *Id.* at 65-67.

Husband testified that he is retired and has two adult daughters in addition to Brother. *Id.* at 208. Husband is involved in Child's care and educational needs on a daily basis. *Id.* at 211-12. Husband testified that Maternal Grandmother insisted on going to custody exchanges with Mother, but that he and Mother began to refuse this because Maternal Grandmother would upset Child. *Id.* at 218-20. Husband described Mother as a committed and dedicated parent. *Id.* at 224.

B.V.J. ("Paternal Grandmother") testified that Father and Wife lived with her for some time after their home was damaged by Hurricane Sandy. N.T., 3/6/2015 (afternoon), at 8. Father and Wife had moved back to their home about two months before the first trial date. *Id.* Paternal Grandmother lives about forty-five minutes from Father's house and would be available to help care for Child if Child was home sick from school or if Father and Wife were working. *Id.* at 10. Father facilitates Paternal Grandmother spending time regularly with Child during Father's custodial time. *Id.* at 16.

Father-in-law testified that Wife and Father live in a separate wing in the house. N.T., 3/6/2015 (afternoon), at 19. Father-in-law intended to transfer the deed of the house to Wife with a living trust for him and his

wife. *Id.* at 20. Father-in-law and his wife are retired and would be able to provide after-school and other care for Child as needed if Father and Wife were unavailable. *Id.* at 22-23.

On May 27, 2015, the trial court issued an opinion and order. The trial court denied Mother's request for relocation. The trial court ordered shared legal custody between Mother and Father. If Mother moved to Maryland, the trial court ordered that Father would have primary physical custody and Mother and Maternal Grandparents would have partial custody. Mother's custody during the school year would be alternating weekends and Maternal Grandparents would have eight hours of custody during one of Father's weekends and three hours on alternating Wednesdays. During the summer vacation, Father would have custody for the first, sixth, and tenth weeks. Mother would have custody during the second through fourth weeks and seventh through ninth weeks. Maternal Grandparents would have custody for the fifth week of summer.

However, if Mother did not move, then Mother would have primary physical custody of Child. In that scenario, Father would have the same custody that was afforded to Mother if she moved and Maternal Grandparents' custody would remain the same.

On June 25, 2015, Mother filed a notice of appeal. On the same date, she filed a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). On July 9, 2015, the trial court issued an opinion pursuant to Pa.R.A.P. 1925(a), in which it referred to its May 27

opinion and responded to the issues that Mother preserved in her concise statement.

Mother raises the following issues for our review:

I.      Whether the trial court erred as a matter of law and/or abused its discretion in determining that Mother's proposed move qualified as a relocation pursuant to 23 Pa.C.S.A. §§ 5322 and 5337?

II.     Whether the trial court erred as a matter of law and/or abused its discretion in deciding the issue of relocation before making a custodial decision based upon the best interests of the children?

III.    If it is determined that Mother's proposed move qualified as a relocation, did the trial court err as a matter of law and/or abuse its discretion in denying Mother's request to relocate and in not awarding primary custody to Mother in Maryland?

IV.     Whether the trial court erred as a matter of law and/or abused its discretion in failing to consider the relocation factors in awarding Father primary physical custody in New Jersey if Mother is to move to her proposed new residence in Maryland?

V.      Whether the trial court erred as a matter of law and/or abused its discretion in awarding Maternal Grandparents rights of partial physical custody without properly evaluating the factors as set forth in 23 Pa.C.S.A. § 5328?

VI.     Whether the trial court erred as a matter of law and/or abused its discretion in failing to consider and give the appropriate weight to the well-reasoned preferences of the child?

Mother's Brief at 4-5.

Our standard of review in child custody is as follows:

In reviewing a custody order, our scope is of the broadest type and our standard is abuse of discretion. We must accept findings of the trial court that are supported by competent

- 12 -

evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the presiding trial judge who viewed and assessed the witnesses first-hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

*D.K. v. S.P.K.*, 102 A.3d 467, 478 (Pa. Super. 2014) (quoting *J.R.M. v. J.E.A.*, 33 A.3d 647, 650 (Pa. Super. 2011)).

Mother first asserts that the trial court erred in determining that Mother's move to Maryland constituted a relocation. Mother argues that the move would not impair Father's custody because Father still would be able to participate in his weekend and summer custody schedule. Mother contends that the increase in distance is minimal. Mother also argues that the move would not interfere with Maternal Grandparents' partial custody. Mother's Brief at 14-17.

The statute defines a relocation as "[a] change in a residence of the child which significantly impairs the ability of a nonrelocating party to exercise custodial rights." 23 Pa. C.S.A. § 5322. We have not often had the opportunity to confront whether a proposed move constitutes a relocation under this definition. However, in *C.M.K. v. K.E.M.*, 45 A.3d 417 (Pa. Super. 2012), we found that a proposed move of sixty-eight miles did constitute a relocation. In that case, the mother had primary custody and the father had custody every other weekend and one weeknight for two-and-

one-half hours. *Id.* at 419-20. The father was found by the trial court to be actively involved in the child's life, including school and extracurricular activities. *Id.* at 420. Rejecting the mother's contention that there was no substantial impairment in the father's custody because his custodial time would increase under the mother's proposal, the Court determined that the proposed move would significantly threaten the father's ability to exercise custody. *Id.* at 426. The Court cited attendance at the child's school, sports, and medical appointments as evidence of the father's involvement. We stated that "[t]he record confirms the trial court's conclusion that [the mother's] proposed relocation would break the continuity and frequency of [the father's] involvement with [the child] and therefore threatens significant impairment of [the father's] ability to exercise his custodial rights." *Id.*

Here, the trial court made a similar finding. First, the trial court cited Mother's exhibit that demonstrated that her move would add approximately fifty miles each way to the travel between Mother's and Father's homes. The court found that would increase Child's travel by two hours for every weekend exchange. Further, the eight-hour round trip would significantly curtail Father's ability to attend Child's sporting or school events. Trial Court Opinion ("T.C.O."), 5/27/2015, at 5. The trial court also considered the impact of the proposed move upon Maternal Grandparents, who attend Child's sports practices, games, and school events "on a regular basis." *Id.* at 6. The new location would require an approximately four-hour round trip,

- 14 -

which would significantly hinder Maternal Grandparents' ability to exercise their partial custody rights because "[i]t would be fairly implausible for Maternal Grandparents to regularly attend [Child's] soccer games or other school and extracurricular activities during the week." *Id.*

The record supports the trial court's finding that Mother's proposed move would substantially impair custody. Although Father's custodial time would not decrease, a lack of reduction of custodial time does not, by itself, preclude finding a substantial impairment in custody. *See C.M.K.*, *supra*. Father has attended Child's sports and school events, even outside of his custodial periods. Father has maintained a presence in Child's medical care by being in regular and consistent contact with Dr. Ingram. Father has participated in the extra academic activities that have been designed to aid with Child's learning difficulties. The extra distance and a new psychologist and school threatens impairment of Father's ability to participate in these parts of Child's life. Further, the greatly increased distance for Maternal Grandparents would impair their ability to participate in Child's activities at the level they currently do. Given the support for the trial court's findings, the trial court did not abuse its discretion in determining that Mother's proposed move would impair the custody rights of the nonrelocating parties and, therefore, was a relocation.

Mother next argues that the trial court erred in deciding relocation before engaging in an analysis of Child's best interest. Mother asserts that

the trial court should have conducted both analyses in unison, rather than in sequence. Mother's Brief at 18-19.

When awarding custody, the trial court must determine the child's best interest by considering all relevant factors as outlined in 23 Pa.C.S.A. § 5328:

(1) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party.

(2) The present and past abuse committed by a party or member of the party's household, whether there is a continued risk of harm to the child or an abused party and which party can better provide adequate physical safeguards and supervision of the child.

(2.1) The information set forth in section 5329.1(a) (relating to consideration of child abuse and involvement with protective services).

(3) The parental duties performed by each party on behalf of the child.

(4) The need for stability and continuity in the child's education, family life and community life.

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's maturity and judgment.

(8) The attempts of a parent to turn the child against the other parent, except in cases of domestic violence where reasonable safety measures are necessary to protect the child from harm.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S.A. § 5328(a).

In addition, when considering whether to permit a relocation, the trial court must consider the following factors:

(1) The nature, quality, extent of involvement and duration of the child's relationship with the party proposing to relocate and with the nonrelocating party, siblings and other significant persons in the child's life.

(2) The age, developmental stage, needs of the child and the likely impact the relocation will have on the child's physical, educational and emotional development, taking into consideration any special needs of the child.

(3) The feasibility of preserving the relationship between the nonrelocating party and the child through suitable custody arrangements, considering the logistics and financial circumstances of the parties.

(4) The child's preference, taking into consideration the age and maturity of the child.

(5) Whether there is an established pattern of conduct of either party to promote or thwart the relationship of the child and the other party.

(6) Whether the relocation will enhance the general quality of life for the party seeking the relocation, including, but not limited to, financial or emotional benefit or educational opportunity.

(7) Whether the relocation will enhance the general quality of life for the child, including, but not limited to, financial or emotional benefit or educational opportunity.

(8) The reasons and motivation of each party for seeking or opposing the relocation.

(9) The present and past abuse committed by a party or member of the party's household and whether there is a continued risk of harm to the child or an abused party.

(10) Any other factor affecting the best interest of the child.

23 Pa.C.S.A. § 5337(h).

In a similar case, we found no error when a trial court denied relocation and made custody contingent upon whether or not the mother moved. *S.J.S. v. M.J.S.*, 76 A.3d 541, 544 (Pa. Super. 2013). There, the mother complained that the trial court should have engaged in a best interest analysis and then the relocation analysis. *Id.* at 549. However, because the trial court considered all of the factors of both sections and set forth a detailed and comprehensive discussion, and because "the two analyses are not entirely separate," we held that "it as suitable to engage in a dual analysis and enter one order." *Id.* at 549-50.

Here, the trial court considered all of the factors and provided an analysis that thoroughly discussed those factors and considered Child's best interest. T.C.O. at 5-14, 19-25. After engaging in that analysis, the trial court issued a single order addressing both issues. We can find no authority, and Mother provides none, to suggest that the trial court must

engage in a section 5328 analysis first. Hence, the trial court did not err in addressing relocation first in its order.

Mother next argues that the trial court erred in denying Mother's request to relocate. Mother contends that the trial court did not consider that the move to Maryland would improve her quality of life and, therefore, improve Child's life as well. Mother relies upon better career opportunities and the ability to spend more time at home as evidence of that improvement. Mother argues that the court did not give sufficient weight to her testimony that the schools in Maryland would be able to meet Child's needs when the court found that a move would have a negative impact on Child. Mother also maintains that the trial court treated Child's testimony inconsistently by discounting it in the relocation analysis and giving it some weight in the best interest analysis.[3] Mother's Brief at 19-28.

The trial court concluded that, after weighing all the relocation factors, the move was not in Child's best interest. T.C.O. at 15. The court cited Child's special education needs that are well-met in his current school and by his current psychologist, as well as the emotional distress that Child would encounter in leaving his familiar environment. *Id.* Further, the trial court found Mother's testimony to be inconsistent with regard to the benefits of a

---

[3] Mother makes this same argument in her final issue on appeal. We address her concerns about the trial court's weighing of Child's testimony in the discussion of her final issue.

move. The trial court did not believe Mother's testimony that her commuting time would be significantly shorter or that her move was required by her employer. *Id.* at 12. The record amply supports the trial court's findings. Both Dr. Ingram and Dr. Thomas opined that moving would be a difficult transition for Child. That Child has shown great progress with Dr. Ingram and his academic interventions are not disputed. To the extent that Mother invites us to re-weigh the evidence or re-consider the trial court's credibility determinations, we are unable to do so. *See D.K.*, *supra*. Given the support in the record for its findings, the trial court did not abuse its discretion.

Mother next argues that the trial court erred in not analyzing the relocation factors when it awarded primary custody to Father if Mother moved to Maryland. Mother contends that the move to New Jersey would be a relocation for Child, and that the trial court only discussed the relocation factors in connection with Mother's move to Maryland. Mother's Brief at 30-34.

In *D.K.*, *supra*, the father lived in Pittsburgh while the mother lived in North Carolina. The father had primary custody of the children. When the mother filed for primary custody, the father objected that the mother had not complied with the notice provisions of the relocation statute. *D.K.*, 102 A.3d at 469-70. After conducting a statutory analysis, "we conclude[d] that where neither parent is relocating, and only the custodial rights of the parties are at issue, section 5337 of the Child Custody Act is not *per se*

triggered." *Id.* at 474. However, we also held that, when a child would move a significant distance, the trial court should consider the relevant relocation factors in its best interest analysis. *Id.* at 477-78. Although most of the relocation factors have a counterpart in the best interest factors, some do not. Specifically, we cited the following factors that are not already encompassed by the best interest factors:

> the age, developmental stage, needs of the child and the likely impact the child's change of residence will have on the child's physical, educational and emotional development (23 Pa.C.S.A. § 5337(h)(2)), the feasibility of preserving the relationship between the other parent and the child (23 Pa.C.S.A. § 5337(h)(3)), and whether the change in the child's residence will enhance the general quality of life for the child (23 Pa.C.S.A. § 5337(h)(7)).

*Id.* at 477.

In the instant case, Mother is relocating, but Father has resided at his New Jersey residence for years, notwithstanding a forced temporary change in residence due to storm damage to his home. Applying *D.K.*, section 5337 does not apply to Father's request for primary custody. However, the trial court was obligated to consider any relevant relocation factors in considering Father's custody request. The trial court analyzed the relocation factors, focusing upon Mother's move to Maryland, and the best interest factors, while also discussing New Jersey, York, and Maryland. Of the three specific relocation factors that the *D.K.* Court cited for additional consideration, the trial court considered Child's needs and the impact of a change in residence. The trial court found that any change in residence would have a negative

impact upon Child because of the change in psychologist and school, and the diminution of the important role Maternal Grandparents play in Child's life. T.C.O. at 8-9. The trial court also found that Father would permit continuing contact to preserve the relationship between Child and Mother. *Id.* at 19. The trial court concluded that any move by Child would not have a positive impact on his quality of life because of the change to his educational plan, having to find a new psychologist, additional travel time, and loss of his friends and significant access to Maternal Grandparents. *Id.* at 12. The trial court gave adequate consideration to all the factors that are required by *D.K.* The court concluded that it was in Child's best interest to remain in York. However, if Mother relocated to Maryland and Child could not stay in York, the trial court found that it was in Child's best interest to be with Father, who will promote Child's relationship with Mother and Maternal Grandparents. The record supports the court's findings and conclusions. There is no error of law or abuse of discretion.

Mother also argues that the trial court erred in awarding partial custody to Maternal Grandparents. Mother asserts that, pursuant to section 5328(c), the trial court must consider whether a custody award to a grandparent interferes with the parent-child relationship and whether the award is in the best interests of the child. Mother argues that Maternal Grandparents' custody interferes with her relationship with Child because Child does not display his "normal personality and demeanor" when he returns from his custody with them. Mother asserts that Maternal

Grandparents have opposed her move for the purpose of interfering with her relationship with Child. Mother concludes that the custody award was not in Child's best interest. Mother's Brief at 35-39.

In considering whether to award partial custody to grandparents who have standing because the parents are separated or divorced, the trial court must consider the following in its best interest analysis:

> (i) the amount of personal contact between the child and the party prior to the filing of the action;
>
> (ii) whether the award interferes with any parent-child relationship; and
>
> (iii) whether the award is in the best interest of the child.

23 Pa.C.S.A. § 5328(c)(1).

Here, the trial court considered that Maternal Grandparents had "played a substantial role" in Child's early years, providing childcare and support. T.C.O. at 7. The trial court credited Dr. Ingram's testimony that Maternal Grandparents' involvement with Child is important to him. *Id.* at 10. The trial court recognized that Mother and Maternal Grandparents' relationship is contentious. *Id.* at 25. However, considering all this, the trial court determined that it was in Child's best interest to continue to have court-ordered time with Maternal Grandparents to preserve that important relationship. *Id.* at 26. The trial court committed no error of law, because it considered all of the factors as required by statute. Further, the record provides support for the trial court's findings. The court did not abuse its discretion.

Finally, Mother argues that the trial court erred in not giving weight to Child's testimony. Mother again contends that the trial court reached inconsistent conclusions from Child's testimony because, in its relocation analysis, the trial court found that Child was concerned about moving, but found the factor to be neutral, and, in its best interest analysis, the trial court found that Child's testimony leaned in favor of Maternal Grandparents. Mother also argues that Child's testimony demonstrated that he wanted to spend more time with Mother so the trial court should have concluded that the relocation, which would have cut down Mother's commuting time, was in Child's best interest. Mother's Brief at 39-41.

We find no inconsistencies in the trial court's consideration of Child's testimony. In both analyses, the trial court cited Child's apprehension about moving, but ultimately relied upon Dr. Ingram's opinion that Child's thoughts about where he wants to live are too easily swayed by Child's most recent custody experience. There is no error in the trial court's reliance upon the opinion of Child's treating psychologist in this regard. With regard to relocation, the trial court found that Child expressed reluctance about moving, which could have weighed against relocation. However, the trial court credited Dr. Ingram's testimony that Child was influenced by his most recent custodial period, and hence did not give much weight to Child's testimony. In the best interest analysis, the trial court cited that same testimony from Dr. Ingram, but also credited Child's testimony that he wished for time with Maternal Grandparents. The trial court still did not give

much weight to that testimony, stating that it "weighs slightly in favor of Maternal Grandparents," even given the strength of Child's testimony. T.C.O. at 22. In both instances, the trial court did not place much weight upon Child's testimony based upon the opinion of Dr. Ingram. The trial court was entitled to credit Dr. Ingram's testimony and did not abuse its discretion in doing so. Further, we may not reweigh the evidence. ***See D.K.***, *supra*.

Finally, the trial court did not credit Mother's testimony that the move to Maryland would reduce her commuting time significantly. T.C.O. at 12. Therefore, even if the trial court had placed greater weight upon Child's testimony that he wanted to spend more time with Mother, it would not have concluded that the relocation would serve that goal. We may not re-weigh the evidence. ***See D.K.***, *supra*. The record supports the trial court's conclusions. There is no abuse of discretion.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/7/2015

- 25 -